## Commonwealth *v.* Caulfield, Appellant.

*Criminal law—Oleomargarine—Evidence.*

On the trial of an indictment for the illegal sale of oleomargarine witnesses may be permitted to testify as to the resemblance of the article sold to yellow butter, without the commonwealth being required to explain the nonproduction of the article itself.

Where on the trial of an indictment for the illegal sale of oleomargarine, the defendant alleges that all oleomargarine, where there is no ingredient introduced solely for coloring purposes, is naturally yellow in color, the commonwealth may be permitted in rebuttal to introduce in evidence a sample of oleomargarine white in color.

*Constitutional law—Title of act—More than one subject—Act of May 29, 1901, P. L. 327.*

The Act of May 29, 1901, P. L. 327, relating to the sale of oleomargarine is not unconstitutional as being insufficient in title.

Argued Dec. 12, 1904. Appeal, No. 95, Oct. T., 1904, by defendant, from judgment of Q. S. Blair Co., June T., 1903, No. 4, on verdict of guilty in case of Commonwealth v. Phillip E. Caulfield. Before RICE, P. J., BEAVER, SMITH, PORTER, MORRISON and HENDERSON, JJ. Affirmed.

Indictment for illegal sale of oleomargarine. Before BELL, P. J.

At the trial the court admitted under objection and exception two witnesses to testify as to the color of the oleomargarine sold by defendant, and its resemblance to yellow butter. [1, 2]

The court also admitted in evidence a sample of white oleomargarine offered in rebuttal by the defendant. [3]

Counsel for the commonwealth, in addressing the jury, used the following language:

[But there is one thing I want to call your attention to.

They say the absence of this sample is unaccounted for, that we have not accounted for the absence of this sample. I say that they could have asked the witness just as well as we where that sample was. They want to know now where it is. Why did n't they ask, if they had that curiosity? There was the witness on the stand; he was sworn. They had the same right that we had to ask him where it was, and if they were so anxious about this sample, they ought to have asked him where it was, then possibly they would have got exactly from the witness who knew the situation with reference to this sample.] [4]

The court charged in part as follows:

[But you will observe that in this act the legislature goes on to say that nobody shall sell any oleaginous fat or substance unless he takes out a license; provided, however, that even when he has a license, he must see to it that the oleaginous substance shall be kept free from all coloration or ingredients causing it to look like yellow butter. Now that is a strong expression of legislative intent that it shall be made and kept free from coloration, and in view of the language in this act of 1901, we instruct you as a matter of law that the fact that no artificial coloration was introduced in this oleomargarine is no defense. We say the legislative intent was the manufacturer of oleomargarine must make it so that it does not look like butter, and must keep it free from looking like yellow butter.] [5]

Defendant offered these points:

3. The act of May 29, 1901, is unconstitutional. *Answer:* Refused. [6]

4. The act of May 29, 1901, under which this indictment is framed is unconstitutional for the reason that the body of the act contains two or more subjects, and even these subjects are not clearly expressed in the title. It contains a method of procedure in a civil suit for the collection of a penalty and a method of procedure to obtain an injunction, and also provides for punishment by contempt; it imposes the duties upon every constable as well as the dairy and food commissioner; it makes provision for the duty of the judge for the issuance of summary process; it provides for the accumulation of a special fund that may be drawn out upon a warrant signed by the secretary of agriculture and approved by the auditor general; it provides

for inspection of carriages, cars, vessels and cans used in the transportation and sale of any dairy products; it provides for the issuance of a semiannual bulletin by the dairy and food commissioner; none of these provisions are expressed in the title. *Answer:* Refused. [7]

Verdict of guilty, upon which judgment of sentence was passed. Defendant appealed.

*Errors assigned* were (1–3) ruling on evidence, quoting the bill of exceptions; (4) in permitting counsel to use the language quoted above; (5–7) above instructions, quoting them.

*Simon R. Huss* and *Thomas H. Greevy,* for appellant.—Opinions as to the color of the oleomargarine and its resemblance to yellow butter, in the absence of the sample sold being unaccounted for, are not competent and sufficient to convict.

An alleged sample of white oleomargarine without proof that it is oleomargarine is not competent as evidence that it can be manufactured white: Schollenberger v. Penna., 171 U. S. 1 (18 Sup. Ct. Repr. 757).

After an exhaustive research for authorities we fail to find a single decision construing color clauses in oleomargarine laws in the manner contended for by the commonwealth. They all expressly limit such clauses to artificial coloration not caused by the natural ingredients of oleomargarine. To this effect is Plumley v. Massachusetts, 155 U. S. 461 (15 Sup. Ct. Repr. 154); People v. Arensberg, 105 N. Y. 123 (11 N. E. Repr. 277); Ammon v. Newton, 50 N. J. L. 543 (14 Atl. Repr. 610); Com. v. Heimberg (Superior Court of Massachusetts not found in the reports); Bennett v. Carr, 96 N. W. Repr. 26; Com. v. Vandyke, 13 Pa. Superior Ct. 484; Com. v. McCann, 14 Pa. Superior Ct. 221.

The act is unconstitutional, for the reason that it contains two or more subjects and those subjects are not clearly expressed in its title, in contravention to article III, section 3, of the state constitution.

*A. H. Woodward,* with him *Wm. L. Hicks,* district attorney, and *Thomas C. Hare,* for appellee.

OPINION BY RICE, P. J., January 17, 1905:

The sale of oleomargarine, for which the defendant was indicted under the Act of May 29, 1901, P. L. 327, was made in December, 1902. On the trial of the case, which took place in January, 1904, the man who bought it, and the state chemist who analyzed it, were permitted to testify under objection and exception as to its resemblance to yellow butter. One testified that it was quite yellow, and looked like yellow butter, the other, that "it was distinctly yellow, having the appearance of yellow butter, not a deep orange yellow, but distinctly a yellow appearance like yellow butter." This was not mere opinion evidence, which could be given only by an expert, but related to a fact which was ascertainable by the mere exercise of the sense of sight possessed by the ordinary person. Nor was it secondary evidence, which could not be given until after the nonproduction of the article for the inspection of the jury was accounted for. The question for the jury to decide was, what was the color of the oleomargarine at the time of the sale, and it is not certain that they could have determined it by a mere inspection a year or more later. For this reason, as well as others that might be suggested, we are unable to agree with the learned counsel for the defendant that a view of the article itself by the jury was the only fair method of determining the question before them. We can conceive of cases where the circumstances might be such that the unexplained nonproduction of the article, like the nonproduction of other evidence which it is to the interest and within the power of a party to produce, would be ground for unfavorable inference against the prosecution. But even in such cases it would be for the jury to say what weight should be attached to the omission in the determination of the question before them. We see no error in the admission of the evidence as to the color of the oleomargarine sold by the defendant or in refusing to give binding instructions in his favor upon the ground that it was not produced at the trial for the inspection of the jury.

The remarks of counsel for the commonwealth addressed to the jury in his closing argument, which are quoted in the fourth assignment, were evidently made in answer to the comments of the defendant's counsel upon the fact that the prosecution had neither produced the oleomargarine in question, nor ac-

counted for its nonproduction. It was an equally obvious fact that counsel for defendant in cross-examining the commonwealth's witnesses did not ask them as to its whereabouts, and we are of opinion that the latitude, which counsel rightfully have in arguing to the jury upon the facts and the conduct of the trial, was not exceeded by calling their attention to it and suggesting to them that the argument based on the nonproduction of the oleomargarine would have had greater force if they had brought out the fact that it was still in existence and could be produced. If it had been the legal duty of the commonwealth to produce it or account for its nonproduction a different question would be presented.

The specific objection urged against the admission in evidence, in rebuttal, of a substance alleged to be white, or yellowish white, oleomargarine is, that there was no proof " that it was commercial oleomargarine, or oleomargarine, a substitute for butter." The purpose of the offer was to show that oleomargarine is made and sold, which, as to color, does not resemble yellow butter ; this to rebut the testimony introduced by the defendant upon the same general question. The witness who identified the sample testified that he had had wide experience as a chemist in examining oleomargarine and butterine, extending over a period of twelve years ; that he bought the sample in the open market at Pittsburg ; that he analyzed it and found it to be oleomargarine. He was unable to state all of the ingredients of which it was composed. If there were a fixed and unvarying formula for the manufacture of oleomargarine, it might be argued, at least with plausibility, that the sample should not have been admitted in evidence without preliminary proof that it contained the ingredients, compounded according to the proportions, and treated in the process of manufacture in the mode, prescribed by the formula. But there is no such formula prescribed by law, nor, as we have pointed out in the case of Commonwealth v. Mellet, ante, p. 41, is there any which is invariably followed by all manufacturers. Hence we cannot say that the court erred in admitting the sample in evidence although the testimony of the witness did not come up to the standard above suggested.

The act is assailed upon the ground that it is in contravention of the constitutional provision that no bill, except general

appropriation bills, shall be passed containing more than one subject, which shall be clearly expressed in the title. "In determining the unity of the subject, regard must of course be had to the ultimate object to be attained. Details leading to the accomplishment of that object are cognate to the subject of legislation, and therefore form a part thereof:" Road in Phœnixville, 109 Pa. 44. "The unity of the subject of a statute is to be determined by its paramount purpose rather than by the details through which that purpose is to be accomplished. The subject may have but one object, while the measures necessary for the attainment of that object may necessarily embrace many subordinate subjects, differing in their nature and particular effect, yet all contributing to it, and comprised within the principal subject:" Commonwealth v. Jones, 4 Pa. Superior Ct. 362. Viewing the statute in the light of these principles, which are well settled and sustained by numerous cases, it is impossible to declare that it contains more than one subject within the meaning of the constitution. The title gives ample notice of every provision upon which the validity of this conviction depends; and even if it were to be conceded that it does not give adequate notice of the provisions which are referred to in the defendant's fifth point (seventh assignment of error), yet it would not necessarily follow that the other provisions are invalid. An entire act is not necessarily unconstitutional because the title fails to give notice of some particular matter contained therein. The general rule has been to sustain the portion of which the title gives notice. This act is clearly within the general rule, not within any recognized exception to it. We, therefore, need not discuss the validity of those provisions referred to in the defendant's point until a case arises in which they are involved.

The remaining questions raised by the assignments have been discussed by us in the case of Commonwealth v. Mellet, ante, p. 41, in which we herewith file an opinion.

All the assignments of error are overruled, the judgment is affirmed and the record remitted to the court below to the end that the sentence be carried into effect.